UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL J. McCORMICK,

    Plaintiff,

v

JOSEPH M. GASPER, in his individual and official capacities, and the Michigan State Police, an agency of the State of Michigan,

    Defendant.

Case No.
Hon:

James K. Fett (P39461)
Fett & Fields, P.C.
805 E. Main St.
Pinckney, MI  48169
734-954-0100
Fax: 734-954-0762
jim@fettlaw.com
Attorney for Plaintiff

## ". . .[I]t is permissible to remedy *discrimination*. It is not permissible to remedy *disparity . . ."* - *Middleton v City of Flint,* 92 F3d 396, 406 (6th Cir 1996)

## "Way too White and way too male" - *Defendant Gasper*

## PLAINTIFF'S COMPLAINT AND JURY DEMAND

Plaintiff Michael J. McCormick, through his counsel, Fett & Fields, P.C., states the following claims against Defendants:

## NATURE OF CLAIM

1. This is a *Fourteenth Amendment, 42 U.S.C. §1983 Equal Protection and Elliott-Larsen Civil Rights Act ("ELCRA")* action for damages and to end blatant racial and gender preferences. Plaintiff also asserts a retaliation claim based on his opposition to the illegal racial and gender preferences. Finally, Plaintiff will amend to include Title VII claims when he receives his right to sue letter.

## JURISDICTION AND PARTIES

2. Plaintiff invokes the jurisdiction of this Court pursuant to *28 U.S.C. §§1331, 1343(a)(3), 1343(a)(4), and 28 U.S.C. §1367*.

3. The events giving rise to this cause of action occurred in the Western District of Michigan.

4. The amount in controversy exceeds $75,000.00, exclusive of interest, costs and attorney fees.

5. Plaintiff is a White male, a citizen of the United States and the State of Michigan; he joined the Michigan State Police in March 1996 and is now a lieutenant.

6. Gretchen E. Whitmer is the duly elected Governor of Michigan and an ardent proponent of the affirmative action preferences prohibited by the *Michigan Constitution of 1963, Art I, § 26*, which she euphemistically refers to as "Diversity." See *Executive Directive, para 2, d* (providing for modern day affirmative action plans) and **Exhibit A.**

7. Defendant Michigan State Police ("MSP") is the state's premier law enforcement agency; as a para-military organization, its members scrupulously follow policy and orders issued by superiors; a claim will be brought against the MSP under Title VII, 42 USC § 2000 et seq. upon Plaintiff's receipt of a right to sue letter.

2

8. Defendant Joseph M. Gasper is the Director of the MSP and the architect of the MSP's most recent "affirmative action" policy (the "Affirmative Action Directive") designed to displace White males at all levels of the MSP with minorities and females; he is sued in his official capacity for prospective injunctive relief and in his personal capacity for money damages under 42 USC § 1983.

9. Defendant Gasper has directed that the MSP set aside 25% of its positions for minorities and 20% for females throughout its ranks even though these percentages cannot be achieved without lowering standards and discriminating against White males in favor of minorities and females; in any event, the relevant qualified work force is inadequate to fill these set asides.

## MSP'S STORIED HISTORY OF RACIAL PREFERENCES

10. The MSP's storied history of racial and gender preferences stretches all the way back to the early 1980s.

11. It was then that the MSP adopted unconstitutional measures to increase the number of Blacks in its ranks.

12. One such measure "Augmentation," implemented in 1981, entailed lowering the entrance and promotional standards for blacks and eventually females.

13. "Augmentation" allowed minorities and females to qualify for promotion to sergeant with test scores of 83 and above, while White males qualified only with scores in the middle to high 90s, depending on the year and quota for minorities. See *Herendeen v MSP,* 39 FSupp 2d 899, 902-903 (WD Mich 1999).

14. Command officers were also ordered to consider race and gender each and every time they made promotions from the discriminatorily assembled applicant pool. See *Herendeen,* 39 FSupp 2d at 904.

15. The MSP has conceded in other litigation that it achieved representation of minorities and females in its workforce which exceeded their representation (percentage) in the relevant qualified workforce in the early 90s; there has been a judicial finding to this effect as well.

16. The MSP continued these naked racial and gender preferences through the 1990s until courageous Trooper Thomas A. Cremonte in 1996 obtained an injunction barring racial and gender preferences in promotions. See **Exhibit B.**

17. The MSP soon violated the injunction and were ordered by the Court to cease and desist; old habits die hard and the MSP continued to discriminate against White males in hiring, promotion and discipline, albeit in a more nuanced, covert manner.

18. Despite the injunction and the fact that it is undisputed that the MSP never engaged in institutional racial or gender discrimination, preference proponents within and without the MSP continued to demand measures to equalize the percentage of minorities in the MSP *workforce* with their percentage in the *population*, which are unconstitutional. *Middleton v. City of Flint,* 92 F3d 396, 406 (6th Cir. 1996) (That is ". . .[I]t is permissible to remedy *discrimination*. It is not permissible to remedy *disparity* without more. . ." (emphasis in original)).

19. The preference proponents made these demands despite the fact that the percentage of Blacks and females in MSP's *workforce* exceeded their percentages in the *relevant qualified workforce* and for Blacks, during most periods, their percentage exceeded their percentage of the *population*.

20. Similarly, the appointment of 2 Black males, a Hispanic and a female to the Director position failed to appease the preference proponents.

21. Because of the pressure brought to bear by White male litigants, the MSP did not acquiesce to the demands of the preference proponents by reinstituting the naked racial and gender

preferences referenced above (it did continue with the covert, less effective, more nuanced measures, to be sure).  See e.g. *Cremonte v MSP, Keuhn v MSP, Herendeen v MSP, Krafft v MSP, Lesnau v MSP, Galbraith v MSP and Breedveld v MSP.*

22.     The preference proponents were further stymied by the Michigan Civil Rights Initiative, a referendum which culminated in amendment of the Michigan Constitution effective December 23, 2006 to bar racial and gender preferences in government employment, contracting and college admissions, see *Art 26, Affirmative Action.*

23.     The MSP first applied its nuanced, more covert, practice of racial and gender preferences to Plaintiff in 2015 when it double-promoted a less qualified and less senior Black female detective sergeant to a first lieutenant position as the Professional Standards Section ("PSS") Commander over Plaintiff.

24.     Powell was the least suited for the position of the five applicants.

25.     Nonetheless, pursuant to its pattern and practice of promotion based on race and gender, the MSP promoted the Black female detective sergeant over Plaintiff, then a lieutenant, in September 2015.

26.     Michigan's specific constitutional prohibition on racial and gender preferences dressed up as "affirmative action," as well as the overwhelming popular opposition to preferences everywhere, required Defendants and others to rebrand racial and gender preferences as "diversity" or "equity and inclusion" policies.

27.     Defendants now disingenuously characterizes the racial and gender preferences as "Valuing Diversity and Inclusion," when in fact the MSP does not value White males and is in fact making great efforts to exclude them.

5

28.     The labels may have evolved but not Defendants' clamor for illegal racial and gender preferences.

## BLACK ADVOCACY GROUPS REIGNITE CLAMOR FOR RACIAL PREFERENCES

29.     The latest impetus for aggressive racial preferences came when then MSP Director Kriste Kibbey Etue in September 2017 had the temerity to post on her personal Facebook page a meme consisting of a picture of Black NFL players kneeling during the National Anthem with the following message superimposed:

> *Dear NFL:  We will not support millionaire ingrates who hate America and disrespect our Armed Forces and Veterans.  Who wins a football game has ZERO impact on our lives.  Who fights for and defends our nation has every impact on our lives.  We stand with the Heroes, not a bunch of rich, entitled, arrogant, ungrateful, anti-American, degenerates. Signed, We the people.*

30.     The outcry from the black advocacy groups was swift and furious.

31.     Despite apologizing repeatedly for exercising her Constitutional right to freedom of speech, these black advocacy groups continued to vilify Director Etue and the MSP.

32.     Then Governor Snyder had the courage to resist the call for Director Etue's resignation and she continued in her position until the end of Snyder's term.

33.     Disgusted with its racial and gender preferences and its impact on the agency, Plaintiff in March 2018 informed the MSP in his response to a worksite survey (**Exhibit C**) of his opposition the preferences:

> There has also been another dark underside to the progress and growth of the agency that I have observed over the last several years that I will now turn my attention to because I feel it is a cancer to the department.
>
> The leadership in its efforts to promote "diversity", particularly with respect to promotions involving command officers, has advanced the careers of several members who are either minorities or women.  This, too, has created consequences and casualties within the department.  Because some of these advancements came about at the expense of the careers of other more

qualified and experienced department members who were not of this desired demographic who were undeservedly passed over for the promotion instead. An example of this was my own expertise when I was passed over for a section commander position by an African-American female with far less experience and fewer credentials than me for the position. In fact, this person was double-promoted from a detective sergeant position over me--a long-serving member (almost 10 years' experience at the time) command officer with nothing but successful and the most diversified command officer experience possible--and other lieutenant 14s in what was clearly a blatant example of reverse discrimination and nepotism.

Another more recent example of this shameful practice was the promotion of a minority to a district commander position over another non-minority department member who was more senior (both in rank and time in service) and with more experience as an assistant district commander in the district in question. That circumstance, too, involved a double-promotion from a 15 to a 17-level position.

Obviously, I don't expect the leadership to admit to this shameful promotion practice as it is cloaked behind the disguise of a Targeted Selection Process that allows the hiring panel to do just that: select the applicant they want going into the hiring interview and to legitimize it afterwards by awarding subjective scores during the interview process which carriers over half the balance of the total possible points. This skewed process allows for the hiring panel to negate and pass over far more experienced, qualified, and deserving applicants for the position.

I am all for diversity in the department and I understand the pressures the agency is under to hire and promote minorities and women but it should never come at the expense of other more qualified non-minority department members. The most qualified and experienced person should get the position regardless of race or sex period. But sadly, in many cases that is not happening. I can assure you, too, these observations are not just my own. I have heard the same type of comments from many department members from across all ranks, especially as it has become more obvious over the more recent years.

Finally, the practice of passing over a lieutenant 14 and to promote a sergeant instead to a 15-level position, is disrespectful to lieutenant 14s as a class, and should be discontinued. Our agency likes to tout itself as a paramilitary organization however as a veteran I can tell you that you will never find this unacceptable practice in the military as it sours morale (as it does in our agency) and is counter to the respected military adage of having to work your way through the ranks…all the ranks. I have and find myself now working for former sergeants who I have trained and mentored and who had previously worked for me. This practice, along with the

aforementioned blatant reverse discrimination and nepotism, is humiliating and has quite frankly created in me much anger and disappointment towards the leadership in the department.  So much so that I hope with a change in the leadership these discriminatory and harmful promotion practices will soon stop.

34. In July 2018, Plaintiff's supervisor, F/Lt. Joseph Brodeur, informed him that the Second District Commander, Captain Deasy, would be speaking to him about his survey response.

35. Although Deasy never spoke to him about the survey response, Deasy would later justify denial of promotion of Plaintiff to the Metro North Post Commander position, writing ". . . when not selected in the past he has made unsupported allegations of impropriety and bias rather than owning his own failures." **Exhibit D:** Deasy 5-8-19 PD 35 Endorsement of Plaintiff.

36. Governor Gretchen E. Whitmer took office on January 1, 2019, and appointed Defendant Gasper as Director with the mandate to increase the percentages of minorities and women in the agency (see **Exhibit A**), even though it was clear to all that this could be accomplished only by trammeling the rights of White male applicants and long-serving White males.

## ROLL OUT OF AFFIRMATIVE ACTION DIRECTIVE TO DISPLACE WHITE MALES WITH MINORITIES AND FEMALES

37. Defendant Gasper on February 6, 2019 convened a Director's Meeting at MSP headquarters where he announced that the number one priority of the agency was affirmative action preferences, which he euphemistically referred to as "diversity."

38. In attendance were Inspector level and above enlisted and civilian personnel.

39. Defendant stated that "diversity" was to be achieved at all levels of the MSP through the recruiting and promotional processes.

40. He also emphasized that gender, race and life experiences carried the same weight as experience and seniority in selecting candidates for hire and promotion.

41. At the Spring Director's Meeting on May 13, 2019, Defendant Gasper again emphasized that the number one priority for the agency is affirmative action and spoke at length about the importance of diversifying all ranks of the MSP.

42. At the MSP Fall Forum on October 8, 2019, Defendant Gasper again reiterated how the number one priority in the Department is affirmative action preferences for minorities and females, which he continued to call "diversity."

43. He also spoke at length about how the MSP is **"way too White and way too male;"** he then revealed that as part of the Affirmative Action Directive the MSP was to set aside 25% of the positions within the MSP for minorities and 20% for females.

## "AFFIRMATIVE ACTION DIRECTIVE" IS MSP STANDARD OPERATING PROCEDURE, A PATTERN AND PRACTICE

44. Coming from the top official of a para-military organization, Defendant Gasper's "Affirmative Action Directive" constitutes standard operating procedure, a pattern and practice of racial and gender preferences designed to displace White males with minorities and females at all levels of the agency.

45. Consequently, MSP has begun a purge of White male command officers as the MSP has begun demoting or terminating them to make way for minorities and females that must make up a quarter of its ranks.

46. Pursuant to Defendant's "Affirmative Action Directive," the MSP has

   a. excluded White male applicants to the extent that a recent applicant roster contains not one White male candidate (see **Exhibit E**);

   b. promoted less qualified minorities and females rather than White males with far superior employment records and experience;

   c. converted high-level command officers from classified civil servants to at-will employees by means of mandatory two-year contracts for newly promoted captains and above, thus paving the way for their certain dismissal by non-

9

       renewal of contracts, and replacement with minorities and females who will, by then, be eligible for promotion to those ranks;

    d.   imposed harsh discipline on White males and little or no discipline on minorities and females for offenses of comparable seriousness; and

    e.   tied command bonuses to discriminating against White males.

47.   Defendant's "Affirmative Action Directive," on its face and as applied, violates:

    a.   the *Michigan Constitution* which provides:

        (i)   in *Art I, §2*:

            Sec. 2 No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. . .

        (ii)   in *Art XI, §5* provides that MSP promotions are to be "determined by competitive examination and performance on the basis of merit, efficiency and fitness and not based on "religious, racial or partisan considerations."

        (iii)   in *Art I, §26. Affirmative Action*:

            (2) The state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity or national origin in the operation of public employment. . .

    b.   the injunction entered in *Cremonte v Michigan State Police,* ("Plaintiff may have injunctive relief, enjoining Defendant from making promotions based upon criteria other than which is contained in the 1963 Constitution, Art XI, § 5.") and

    c.   the *Federal Constitution, Amendment XIV, §1* which provides: " . . . nor shall any state deny to any person . . . the equal protection of the laws."

48.   Notably, the purpose of Defendant's "Affirmative Action Directive" is *not* to remedy past discrimination (which was remedied long ago) or for operational needs.

49.   Rather, Defendant Gasper issued the "Affirmative Action Directive" to (1) satisfy the Whitmer Administration's clamor for the affirmative action preferences barred by Art I, §26 of

the Michigan Constitution of 1963, and (2) placate Black advocacy groups that falsely accuse the MSP of institutional racism.

## APPLICATION OF "AFFIRMATIVE ACTION DIRECTIVE"

50. In the Spring of 2019, Defendants were concerned that they did not have enough Black command officers in the Second District which covers the metropolitan Detroit area.

51. This concern, like the general clamor for preferences, sprang from the Etue incident and the Black advocacy groups' demands.

52. It was in this context that Plaintiff applied for the Metro North Post Commander Position in early May 2019.

53. Plaintiff's application surprised and displeased the MSP command because, on information and belief, it had made a deal with the Second District Commander Captain Thomas Deasy that he would not have to accept an underperforming Black inspector on a lateral transfer if he agreed that, when he promoted his First Lieutenant, Joseph Brodeur, to the Inspector position, he would fill Brodeur's lieutenant position with a certain Black male.

54. A Black male from the Metro North Post was pre-selected to receive the promotion and everyone knew it.

55. His performance and seniority paled in comparison to Plaintiffs.

56. Before the actual selection, Inspection Brodeur called Plaintiff to find out why he applied.

57. Plaintiff responded that (1) he, as a Level 14 Metro North Assistant Post Commander, was in the best position to supervise the Post's troopers and sergeants and (2) he knew the Black male was in line to get the promotion and that promotion would be detrimental to the Post and to the MSP.

58. The MSP did promote a Black male sergeant to Post Commander over Plaintiff, despite Plaintiff's MSP seniority, almost 10 years of experience as a Level 14 lieutenant and other superior credentials.

59. Captain Deasy, the hiring manager, provided Plaintiff a negative endorsement **(Exhibit D)**, citing his protected activity and disappointment with the MSP pattern and practice of preferring minorities and females, writing:

> Lt. McCormick's experience and training qualify him for the position and he is recommended based on the comments by his most recent supervisor. However, my recommendation is not without reservation. He has been disengaged, if not openly disgruntled at times, and appears largely disinterested in being part of the district command team. Further, when not selected in the past he has made unsupported allegations of impropriety and bias rather than owning his own failures.

60. Knowing the futility of his application, Plaintiff withdrew from the interview process.

## COUNT I
## RACE AND GENDER DISCRIMINATION IN VIOLATION OF 42 U.S.C. §1983 (FOURTEENTH AMENDMENT EQUAL PROTECTION) (AGAINST GASPER)

61. Plaintiff incorporates by reference the preceding paragraphs.

62. Plaintiff was a high-performing White male command officer with a sterling employment record until wrongfully denied promotion by Defendant Gasper.

63. Defendant Gasper was acting under the color of state law when he jump-started the MSP standard operating procedure (pattern and practice) of racial and gender preferences in the terms and conditions of employment (as described above), much to the detriment of White males; in other words, Defendant was intimately involved in creating and implementing/enforcing the MSP's new and improved racial and gender preferences. See **Exhibit F.**

64. Defendant deprived Plaintiff of his right to Equal Protection as guaranteed by the *14th Amendment to the United States Constitution* by:

   a. requiring him to abide by the "Affirmative Action Directive" and potentially violate his oath of office which provides:

   ". . . I do further solemnly swear that I will faithfully enforce the laws of this state, discharging the duties of an officer of the Michigan State Police and will preserve, protect and defend the Constitution of the United States and the Constitution of this state. . ."; and

   b. denying him a promotion based on his status as a White male.

65. Defendant is the usual governmental official that discriminates against White males.

66. Defendant's illegal race and gender discrimination has caused Plaintiff damages.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendant Gasper, in his official and personal capacities, as appropriate, for:

   a. Economic damages (personal capacity);

   b. Non-economic damages to compensate for the mental and emotional distress, outrage, and humiliation he has suffered, and continues to suffer, as a result of Defendant's illegal actions (personal capacity);

   c. Costs, interest and reasonable attorney fees as provided by 42 U.S.C. §1988 (both);

   d. Punitive damages against Defendant in his personal capacity;

   e. Reinstatement and an injunction against Defendant's illegal racial and gender preferences (official capacity);

   f. A declaration that Defendant's official capacity conduct as described above violates the state and federal constitutions and statutes; and

   g. Such other equitable relief as the Court deems just.

## COUNT II - 42 USC §1983 RETALIATION
## (AGAINST DEFENDANT GASPER ONLY)

67. Plaintiff incorporates by reference each of the preceding paragraphs.

68. Plaintiff engaged in protected activity under 42 USC § 1983 by opposing the MSP's racial and gender discrimination.

69. Defendant Gasper and the MSP denied Plaintiff a promotion because he opposed the Affirmative Action Directive's racial and gender preferences.

70. Defendant Gasper's denial of Plaintiff's promotion on this basis violates 42 USC § 1983.

71. As a proximate result of Defendant Gasper's illegal conduct, Plaintiff has suffered, and will continue to suffer, emotional distress, especially outrage, lost opportunities, loss of reputation, embarrassment and the physical manifestations of these injuries, as well as economic damages.

WHEREFORE Plaintiff requests that this Court enter judgment against Defendant Gasper, in his official or personal capacity, as appropriate, for:

    a. Economic damages (personal capacity);

    b. Non-economic damages to compensate for the mental and emotional distress, outrage, and humiliation he has suffered, and continues to suffer, as a result of Defendant's illegal actions (personal capacity);

    c. Costs, interest and reasonable attorney fees as provided by 42 U.S.C. §1988 (both);

    d. Punitive damages against Defendant in his personal capacity;

    e. Reinstatement and an injunction against Defendant Gasper's illegal racial and gender preferences (official capacity);

    f. A declaration that Defendant Gasper's official capacity conduct as described above violates the state and federal constitutions and statutes; and

    g. Such other equitable relief as the Court deems just.

## COUNT III
## RACE DISCRIMINATION IN VIOLATION OF THE
## ELCRA AND ART. I, §26 OF THE MICHIGAN CONSTITUTION

72. Plaintiff incorporates by reference the preceding paragraphs.

73. Plaintiff is a White male.

74. Defendants denied Plaintiff's promotion based on his status as a White male.

75. That is, Plaintiff's status as a White male was at least a factor, if not the only factor, that made a difference in Defendants' decision to deny Plaintiff's promotion.

76. Defendants' denial of Plaintiff's promotion violates the Elliot-Larsen Civil Rights Act and Mich Const 1963, Art 1, §26.

77. As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff has suffered, and will continue to suffer emotional distress, including humiliation, loss of reputation, outrage and economic loss.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants providing for:

   a. Economic damages;

   b. Non-economic damages to compensate for the mental and emotional distress, outrage, and humiliation he has suffered, and continues to suffer, as a result of Defendant's illegal actions;

   c. Costs, interest and reasonable attorney fees;

   d. Reinstatement and an injunction against Defendants' illegal racial and gender preferences;

   e. A declaration that Defendants' conduct as described above violates the state and federal constitutions and statutes; and

   f. Such other equitable relief as the Court deems just.

## COUNT IV - RETALIATION IN VIOLATION OF ELCRA

78. Plaintiff incorporates by reference each of the preceding paragraphs.

79. Plaintiff engaged in protected activity under ELCRA and Art I, §26 of the Michigan Constitution of 1963 by opposing the MSP's racial and gender discrimination against himself and other White males.

80. Defendants retaliated against Plaintiff because he opposed racial and gender preferences in his response to his worksite survey.

81. Defendants denial of Plaintiff's promotion on this basis violates ELCRA, MCLA 37.2701(a).

82. As a proximate result of Defendants' illegal conduct, Plaintiff has suffered, and will continue to suffer, emotional distress, especially outrage, lost opportunities, loss of reputation, embarrassment and the physical manifestations of these injuries, as well as economic damages.

WHEREFORE Plaintiff requests that this Court enter judgment against Defendants providing for:

   a. Economic damages;

   b. Non-economic damages to compensate for the mental and emotional distress, outrage, and humiliation he has suffered, and continues to suffer, as a result of Defendant's illegal actions;

   c. Costs, interest and reasonable attorney fees;

   d. Reinstatement and an injunction against Defendants' illegal racial and gender preferences;

   e. A declaration that Defendants' conduct as described above violates the state and federal constitutions and statutes; and

   f. Such other equitable relief as the Court deems just.

Respectfully submitted,

*/s/ James K. Fett*
By:  James K. Fett (P39461)
Fett & Fields, P.C.
805 E. Main St.
Pinckney, MI  48169
734-954-0100
jim@fettlaw.com

Dated:  August 18, 2020          Attorneys for Plaintiff

# JURY DEMAND

NOW COMES Plaintiff Michael J. McCormick, through his counsel Fett & Fields, P.C., and hereby demands trial by jury in the above-captioned matter.

*/s/ James K. Fett*
By:  James K. Fett (P39461)
Fett & Fields, P.C.
805 E. Main St.
Pinckney, MI  48169
734-954-0100
jim@fettlaw.com

Dated:  August 18, 2020          Attorneys for Plaintiff